## PENCE VS. SANDFORD et al.

SWAMP AND OVERFLOWED LANDS: *What certificates not a sale of.*
　Certificates issued by the board of swamp land commissioners, under ordinance nine, were not a sale of the land, but simply evidence of an application to purchase, which the commissioners might subsequently accept or reject, and such certificates secured to the holders no right as against any other purchaser who adopted legal means in securing his lands.

APPEAL from *White* Circuit Court.
Hon. JOHN WHYTOCK, Circuit Judge.
*Coody and Gallagher, Newton & Hempstead*, for appellant.
*B. D. Turner*, for appellee.

STEPHENSON, J.　This suit was brought on the chancery side of the White circuit court, at the fall term, 1859, by Robert W. Sandford, the father of the present appellees, to set aside and cancel the patent certificate by virtue of which the appellant claimed and held possession of the northeast quarter of section five, township five north, range six west, and for possession thereof.

The title which the Sandfords are attempting to assert rests upon the patent certificate of the state land agent of the Little Rock district, issued on the 15th of April, 1859. To enable them to succeed, however, it is incumbent upon them to get rid of a similar certificate issued to Pence, by the same office on the 12th day of April, 1859. This they attempt by show-

ing that Robert W. Sandford, the original complainant, on the 28th day of January, 1853, filed an application with the subcommissioners of the swamp land offices at Pine Bluff and Helena to purchase the lands, by virtue of which application he obtained a priority of right which in a court of equity can be successfully asserted against the certificate of Pence — on the ground that, although the certificate he produces is three days the junior of that of Pence, yet by relation his right to the land dates to January 28, 1853, the date of his application to the subcommissioners of the swamp land office. In order to understand fully the character of this equitable claim of the Sandfords, as well as to learn why and how the land agent should issue two patent certificates for the same land, we are necessarily compelled to go at some length into that bundle of confusion known as the swamp land laws.

The congress of the United States, on the 28th of September, 1850, granted to the state of Arkansas all the swamp and overflowed lands of the state, to aid in constructing the necessary levees and ditches for their reclamation. The act also directs the secretary of the interior to ascertain the lands embraced within the grant and report the same to the governor, and at the request of the governor therefor, direct that a patent shall issue. To enable the state to avail herself of the benefits of this grant the legislature passed the act of January, 1851, which provides for a board of three swamp land commissioners, and defines their duties to be: First, to fix the price of the swamp and overflowed lands donated to the state under the act of congress; second, to determine the locality, extent and dimensions of the necessary drains and levees, in order to reclaim the lands; third, to classify said lands, and to let out the making of said levees and drains by contract.

Sections 4, 5 and 6 provide the mode of payment for work done, which shall be in lands reclaimed, or in scrip, represent-

ing quarter section tracts, which the contractor or his assignee might locate on any unappropriated swamp lands the contractor or his assignee might select. These selections being made and the numbers reported to the board of commissioners, it was made their duty to give to the locator a certificate, upon which the governor was directed to issue a patent.

Pursuant to the above act, and the supplementary act of January 15, 1851, the commissioners proceeded to lay off the state into land districts and open an office in each, for the dispatch of the business enjoined upon them. For the regulation of the board, as well as to guide those having business with them, they adopted a series of ordinances, by which their operations were governed. These ordinances run through and cover the transactions of the board from March 6, 1851, to July 25, 1855.

Ordinance 6, adopted October 14, 1851, provided for the opening of an office in each land division of the state, for the sale of the swamp lands, and the appointment of a subcommissioner to take charge of the same. Among the other prescribed duties of the subcommissioners, they were required to fill up certificates for purchasers, " to which certificates the name of each individual commissioner must be affixed in his own proper handwriting, and the same countersigned by the subcommissioner; and the certificate, when so signed and countersigned, shall entitle the purchaser to the land so bought and sold."

This ordinance is a substantial compliance with the sixth section of the act under which the board was proceeding. The law required the board to issue to the locator a certificate, upon which the governor should issue a patent. The additional requirement of a countersigning by the subcommissioner neither added to nor diminished the value of the paper. Ordinance 6 was, on the 9th of January, 1852, repealed by

No. 9, which provides that the secretary of the board, or the commissioner in charge of any division, " shall issue certificates to all persons who may apply for lands at their office, where the scrip or a duly authenticated account for work done is filed with the same." Upon the presentation of which certificate to the board of swamp land commissioners, when the lands therein described are confirmed to the state, if said certificate is found correct, the holder thereof, being the original applicant, shall receive a full certificate of purchase for the lands described in said certificate."

Sandford's certificate of 1853 was evidently issued in pursuance of the provisions of this ordinance. Was it such a compliance with the law governing the commissioners as would entitle the holder thereof to the land embraced in it, to the exclusion of all other persons?

It would seem from the act creating the board of swamp land commissioners, that the chief use the state had for them was to construct levees and ditches, in order to reclaim the swamp and overflowed lands granted her by the general government. To carry out this object they were vested with plenary powers and large discretion. The mode of payment for the work is only incident to the chief object in view; and although that devolves by the act on the board, the legislature have prescribed specifically how it is to be done. It re-requires the performance of a purely ministerial act, with no discretionary powers, and must consequently be strictly pursued. *Hempstead v. Underhill*, 20. Ark., 358.

The state entrusted to them the selection of the lands, the location of the levees and drains, the amount of work necessary to be done, the letting of contracts, etc. It was their duty to perform all of these things in such manner as in their judgment would best promote the interest of the state; they were also to see that the work was properly constructed

according to contract. That done, their discretionary powers ceased. The law required the commissioners to give the certificate of location, and they alone are authorized to give such a paper as would entitle the holder to take the land, to the exclusion of another. *Phillips v. Cheatham*, 23 Ark., 87. The board, however, by ordinance nine, provides for a certificate wholly unknown to the law under which they acted. The certificate, which they propose to be given to the applicant, in no way answers the purposes of the act. It is simply an application to purchase, which must be presented to the board after the lands have been confirmed to the state; when, if found to be regular, a "full certificate," as contemplated by section 6 of the act of January 6, 1851, should be issued. *Gaster's Heirs v. Gaines*, 23 Ark., 713. It may be presumed, in favor of the board, that their object, in making this provision, was to prevent hardship and confusion, in case any of the lands selected should not be confirmed by congress. But this desire to avoid trouble cannot be held to be such an excuse as would justify a ministerial officer in setting aside the plain letter of the statute; and it must follow that the holder of a certificate, issued under the provisions of this unauthorized attempt at legislation on the part of the board, secured no rights as against any other purchaser who adopted legal means in securing his lands.

The right to postpone the issuance of their certificate until the lands should be confirmed to the state can no where be inferred from the act. Indeed, the history of the law, as well as its text, directly contradicts any such presumption. The act was passed, and all the machinery for the construction of levees and drains, and the sale and disposition of the land, set in motion before the confirmation. In fact one of the duties of the board itself (section 15, act of January 6, 1851) was to ascertain the lands confirmed, and it is very clear to our

minds that the legislature intended that the work of reclama-
tion and the sale of the lands should proceed independent of
the confirmatory act of the general government. We can
very readily see, as the board seems to have done, that seri-
ous conflicts would in all probability arise should any of the
lands so sold by the state fail to be confirmed as swamp and
overflowed lands, but it was no more the business of the
board then to provide against such a collision than it is ours
now.

If they acted at all, they must do so under the law creating
them a board and prescribing their duties. They were not
clothed with power to legislate a remedy for evils growing
out of the execution of the law. *Deloach v. Brownfield*, 22
Ark., 348.

Ordinance No. 9 has not been without its full fruitage of
mischief, and this is not the first time this court has been
called upon to settle contests arising from it. The legislature
also — doubtless with a view to secure the lands to the citizen
who in good faith had deposited his money or scrip in this
way — has attempted, as far as it could be done without
trenching upon the rights of others, to cure the evil. By the
act of January 20, 1855, it is provided that "All persons
holding any certificate or certificates which may have been
issued by the swamp-land commissioners or any one of said
commissioners, or by any one acting under and by authority
of any such swamp-land commissioners, shall present such
certificate or certificates granted as aforesad for any tract or
tracts of swamp and overflowed lands to the land agent for
examination; and should the said land agent find by exam-
ination of the records of his office, that the tract or tracts
designated in said certificate so presented have been confirmed
to the state, as part of the grant of swamp and overflowed
lands, and that the proper number of acres has been paid for,

and there is no conflicting claim thereto, to issue a patent " certificate to and in favor of the original holder of the surrendered certificate."

It is very evident what the legislature intended by this act. It simply means that any holder of the certificates mentioned shall present the same to the agent, and upon proof from his books that the land has been confirmed to the state, the proper number of acres actually paid for, and that there is no conflicting claim thereto, he shall be entitled to a patent certificate without again paying for the land. In other words, that they will allow the person who has in good faith paid his money to the board, or any one of them, or any one acting by or under their authority, to purchase the land without additional cost, provided the land has been confirmed, paid for, and there is no conflicting claim thereto.

It is contended by appellees' counsel that, granting the certificates of Secretary Butts and Subcommissioner Walker do not give the Sandfords a vested right to the lands, the irregularity of their issue is cured by the act quoted above, and those of January 15, 1857, and February 17, 1859. We do not think they can be made to bear that construction. The first of these acts includes within its provisions not only the irregular certificates, but those of the board issued in accordance with law. Now it is clear to our minds that the holder of a certificate from the board, issued by them in conformity to the 6th and 8th sections of the act of January 6, 1851, secures a vested right to the lands which cannot be taken away by the legislature, provided there is no pre-existing claim to the land. We do not, however, controvert the right of the legislature to provide a limitation of the time in which these certificates shall be presented for a patent.

· It seems to us that the more probable reason for the passage of the act of January 15, 1857, was to correct this error

in the act of 1855, which includes these *regular* certificates of the commissioners issued in conformity to law.

The act of January 15, 1857, is as follows: " That the entry of swamp and overflowed lands, made in accordance with the fifth section of an act to provide for the reclaiming of the swamp and overflowed lands donated to this state by the United States, approved January 6, 1851, be, and the same is hereby, confirmed ; and in all cases where such lands were entered before the old board of swamp land commissioners under said section, and are still unconfirmed to the state, the person or persons so entering or holding the certificates by assignment or transfer shall have a preference right, provided the holder be a citizen of the state, to reenter said lands as soon as the same shall be confirmed to this state for the space of sixty days from and after public notice is duly given of said confirmation by the proper land agent for the district in which such lands are situated, and not thereafter."

This is no more of a curing act than that of 1855, above quoted. (*Deloach v. Brownfield, supra.*) Neither was it intended to be, its obvious intent being to fix a period of limitation beyond which, in case of a failure on the part of the holders of certificates issued, in accordance with the sixth section of the law of January 6, 1851, the right to dispose of the lands should revest in the state. It is very clear that the holder of a certificate, issued in conformity with law, needed no curing statute to enable him to take the land; and as no other class is mentioned in the act, we must conclude, to give the statute any meaning at all, that it intended to do just what it does — prescribe a limitation to holders of legal and valid certificates.

If the legislature intended by this act to cover all certificates issued prior to its passage by the board or either of them, or any one acting by or under their authority, why did they

not use language as broad and ample for that purpose as that used in the act of 1875 ? Why particularize the entries made in accordance with the fifth section of the act by and before the board under said section?

The act of February 17, 1858, has no applicability whatever to this case. It provides a course of procedure for the applicant for lands which have not been confirmed at the time of said application. From these conclusions it must follow that the application of Sandford made to the officers at Pine Bluff and Helena secured to him or his assignee no right which could avail him as against the homestead of Pence made in 1856. The time when this homestead was proven up is not definitely shown by the proof, but we must· presume that it was done within the time allowed by law, as he appears subsequently to have been allowed a patent certificate on it; and the granting of this certificate by the land agent on the 12th day of April, 1859, three days before the grant of a like certificate to McCauley, must be held superior to the latter.

When we consider the confused state of the business pertaining to the landed interests of the state prevailing at the time, we can see how easily the agent could commit the error of granting two certificates for the same land. The law directed him to take the books and plats furnished him by the auditor as his guide in issuing patent certificates. These books contained a description of all the swamp and overflowed lands of the state, and, as appears from the proof, at the time Pence made his application, these books showed the land subject to entry. A copy also of the report of the commissioners of lands disposed of by them was furnished him by the auditor, which report contained the same tract reported sold to Sandford. Yet going by the auditor's books, as required by law, he issued the certificate to Pence. Upon the application of McCauley, and the presentation of the Butts and Walker cer-

tificates, he directed his inquiry to a different channel, and, without the precautionary act of examining both sets of books, he was led into the error of issuing a second certificate.

The decree of the White circuit court must, for the reasons we have stated, be reversed, and the prayer of the appellant's cross bill granted. It will be decreed by this court that the patent issued by the governor, on the — day of —, 1859, to the heirs and legal representatives of Robert W. Sandford, the original complainant herein, be set aside and held for naught; that the appellant be quieted in his title and possession of the northeast quarter of section 5, township 5 north, range 6 west; and that the appellees pay the costs of this suit.